IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| MARY SCHEIRER | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CAROLYN W. COLVIN[1] | : | NO. 12-4210 |
| ACTING COMMISSIONER OF SOCIAL SECURITY | : | |


## REPORT AND RECOMMENDATION


M. FAITH ANGELL                                                          October 28, 2013
UNITED STATES MAGISTRATE JUDGE


## I.     INTRODUCTION[2]

This is an action brought pursuant to 42 U.S.C. §405(g) seeking judicial review of a final

decision of the Commissioner of the Social Security Administration (Commissioner) denying

Plaintiff Mary Scheirer's claim for disability insurance benefits (DIB) under Title II of the Social

Security Act (the Act). Presently before this Court are the parties' pleadings, including

Plaintiff's Motion for Summary Judgment or, in the Alternative, Plaintiff's Motion for Remand;

Plaintiff's Brief and Statement of Issues in Support of Request for Review and Motion for

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted, therefore, for Michael J. Astrue as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of 42 U.S.C. §405(g).
[2] The Administrative Record, a Complaint, an Answer, Plaintiff's Motion for Summary Judgment or, in the Alternative, Plaintiff's Motion for Remand; Plaintiff's Brief and Statement of Issues in Support of Request for Review and Motion for Summary Judgment; Defendant's Response to Request for Review of Plaintiff; Plaintiff's Supplemental Brief Per Court Order Entered on January 24, 2013, and Defendant's Letter Response thereto have been filed and reviewed in this action.

Summary Judgment;[3] Defendant's Response to Request for Review by Plaintiff;[4] Plaintiff's Supplemental Brief Per Court Order entered on January 24, 2013,[5] and Defendant's Letter Response, thereto.[6] On January 24, 2013, counsel presented oral argument. For the reasons which follow, I recommend that the relief sought by Plaintiff be denied and that judgment be entered in favor of Defendant, confirming the decision of the Commissioner.

## II.      BACKGROUND AND PROCEDURAL HISTORY

Ms. Scheirer was born on December 7, 1961. Administrative Record[7] at 89-92, 118-121; 139-141. She testified that she graduated from high school and attended Delaware County Community College. Record at 30; 252-253; 256-263. She has past relevant work as a data entry clerk and a file clerk. Record at 20. Ms. Scheirer protectively filed an application for disability benefits on July 15, 2009, alleging an onset date of November 23, 2008, which was amended to July 15, 2009. Record at 29-30. She argues that she is disabled due to multiple medical problems, including degenerative disc disease of the lumbar spine, bilateral carpal tunnel syndrome, chronic obstructive pulmonary disease, obesity, major depression, dependent personality disorder, and rule out cognitive disorder. Plaintiff's Brief at 1, 2.

Ms. Scheirer protectively filed a Title II application on July 15, 2009. Record at 89-92. The claim was initially denied, and, thereafter, she filed a timely written request for a Hearing. A Hearing was held on December 10, 2010, before Administrative Law Judge (ALJ) Deborah Mande in Philadelphia, Pennsylvania. Ms. Scheirer testified, represented by her attorney, Trudy Shivers, Esquire. Vocational Expert (VE) Sherry L. Kristal-Turetsky also testified. Record at 12,

---

[3] Hereinafter "Plaintiff's Brief".
[4] Hereinafter "Defendant's Response".
[5] Hereinafter "Plaintiff's Supplemental Brief".
[6] Hereinafter "Defendant's Letter Response".
[7] Hereinafter the "Record".

26-44. On December 17, 2010, the ALJ issued a decision in which she found that Plaintiff has the following severe impairments: degenerative disc disease of the lumbar spine; chronic obstructive pulmonary disease; obesity, and carpal tunnel syndrome.[8] Record at 14-15. She further opined that Ms. Scheirer is not disabled because she has the residual functional capacity (RFC) to perform sedentary work, except that she can lift and carry ten pounds occasionally, lift and carry two to three pounds frequently, standing or walking a total of two hours and sitting six in an eight-hour day, with no exposure to concentrated levels of dust, fumes, gasses or other pulmonary irritants or extremes of temperature, no more than frequent fingering or handling with the right dominant hand, occasional fingering and handling with the left. Record at 17-19. Ms. Scheirer sought review by the Appeals Council, which was denied on June 20, 2012. Record at 1-3. On July 24, 2012, Plaintiff filed this action alleging that the ALJ's ruling that Plaintiff does not have a severe mental impairment is not supported by substantial evidence and represents a reversible and harmful error of law. She also claims that the ALJ committed a reversible error of law by failing to impose any mental limitations as part of the RFC assessment and in failing to include mental limitations in her questioning of the VE. In addition, Plaintiff asserts that the ALJ

---

[8] The ALJ further opined:

       Although the [plaintiff] also alleges depression and a cognitive disorder, I note that she was referred to therapist Amy Vacarro in August of 2010, by her disability attorney. This resulted in a referral to Delco Psychiatric Associates and then to Behavioral Health services. Although the [plaintiff] has provided a history of long-term depression, there is no evidence in the file of any such complaint prior to August of 2010. Not only is it not alleged in the disability or function report, (Exhibits B3E and B5E), no treating doctor has ever referred her for mental health evaluation or treatment or even noted any symptoms of depression, labile mood, odd affect or cognitive disorder in any records. Assuming that developed in August of 2010, (and taking note that the [plaintiff] appointed attorney Shivers as her representative in this matter on August 6, 2010) there is no evidence that it will continue for a period of 12 continuous months. Further, it is also noted that Ms. Vacarro indicated that the [plaintiff] had attended only 4 appointments between August 2010 and December 2010 (Exhibit B-7F). Therefore, the opinions offered by Ms. Vacarro, the opinion from 2 visits with Delco Psychiatric Associates (Exhibit B-9F), and the opinion from one psychological evaluation at Behavioral Health Services on November 22, 2010, are given no weight. Consequently, the [plaintiff's] alleged mental impairments are not considered to be "severe" pursuant to the regulations, and will not be considered in this decision.

Record at 14-15.

committed a reversible error of law by failing to conduct a thorough inquiry into the types and levels of job stresses involved in the jobs identified by the VE. Finally, Ms Scheirer alleges that the ALJ's failure to accord sufficient weight to the medical source statement completed by Michael A. Kennedy, M.D. is not supported by substantial evidence and represents a reversible and harmful error of law. Plaintiff's Brief at 4-18.

### III.   SOCIAL SECURITY LAW

**A.  <u>Disability Determination</u>**

The Social Security Act authorizes several classes of disability benefits, including DIB benefits. In order to qualify for benefits, a claimant must show that there is some "medically determinable basis for an impairment that prevents him from engaging in 'substantial gainful activity' for a statutory twelve-month period". *Fargnoli v. Massanari*, 247 F.3d 34, 38-39 (3d Cir. 2001) (*quoting Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999)); 42 U.S.C. §423(d)(1). A claimant can establish a disability in either of two ways: (1) by producing medical evidence that one is disabled *per se* as a result of meeting or equaling certain listed impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2000) or (2) by demonstrating an impairment of such severity as to be unable to engage in any kind of substantial gainful work which exists in the national economy. *Heckler v. Campbell*, 461 U.S. 458, 460 (1983); 42 U.S.C. §423(d)(2)(A).

The Commissioner's regulations provide a five-step sequential evaluation process for determining whether or not a claimant is under a disability. 20 C.F.R. §404.1520. Step one states that an individual who is working will not be found to be disabled regardless of medial findings. 20 C.F.R. §404.1520(b). Step two involves evaluating severe impairments. 20 C.F.R. §404.1520(c). Step three requires determining whether the claimant has an impairment or

combination of impairments which meets or equals a listed impairment in Appendix 1. 20 C.F.R. §404.1520(d). Step four states that if an individual can perform past relevant work, he will not be found to be disabled. 20 C.F.R. §404.1520(e). Step five requires that if an individual cannot perform past relevant work, other factors must be considered to determine if other work in the national economy can be performed. 20 C.F.R. §404.1520(f). *See e.g., Ramirez v. Barnhart*, 372 F.3d 546, 550-551 (3d Cir. 2004).

It is the ALJ's responsibility to resolve conflicts in the evidence and to determine credibility and the relative weights to be given to the evidence. *Plummer*, 186 F.3d at 429 (3d Cir. 1999); *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993). The ALJ's conclusions must be accepted unless they are without basis in the record. *Torres v. Harris*, 494 F.Supp. 267, 301 (E.D.Pa. 1980), *aff'd.* 659 F.2d 1071 (3d Cir. 1981).

**B.  Judicial Review of Disability Decisions**

The role of this Court on judicial review is to determine whether there is substantial evidence to support the Commissioner's decision. *Fargnoli*, 247 F.3d at 38 (3d Cir. 2001); *Knepp v. Apfel*, 204 F.3d 78, 84 (3d Cir. 2000). Substantial evidence is defined as the relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Pierce v. Underwood*, 487 U.S. 552, 565 (1988); *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000). It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance of the evidence. *Id.*

It is not the role of this Court to re-weigh the evidence of record or substitute its own conclusion for that of the ALJ. *See e.g., Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). Upon appeal to this Court, the Commissioner's factual determinations, if supported by substantial evidence, shall be conclusive. The conclusiveness applies both to findings of fact and

to inferences reasonably drawn from that evidence. *Fargnoli*, 247 F.3d at 38 (3d Cir. 2001). ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.")

## IV.     THE ALJ'S DECISION

At the December 7, 2010 Hearing, the ALJ received medical evidence, heard Plaintiff's testimony and received testimony from a VE. After considering all the evidence of record, the ALJ concluded that Ms. Scheirer had not been under a disability, within the meaning of the Social Security Act from November 23, 2008, through the date of her decision. Record at 12, 21. The ALJ found:

1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2010.

2. The [plaintiff] has not engaged in substantial gainful activity since November 23, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The [plaintiff] has the following severe impairments: degenerative disc disease of the lumbar spine; chronic obstructive pulmonary disease (COPD); obesity; and carpal tunnel syndrome (CTS) (20 CFR 404.1520(c)).

4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of  the entire record, I find that the [plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can lift and carry 10 pounds occasionally, lift and carry 2 to 3 pounds frequently, standing or walking a total of 2 hours and sitting 6 in an 8 hour day, no exposure to concentrated levels of dust, fumes, gasses or other pulmonary irritants or extremes of temperature, no more than frequent fingering or handling with the right dominant hand, occasional fingering and handling with the left.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).

7. The [plaintiff] was born on December 7, 1961, and was 46 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569 and 404.1569(a)).

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from November 23, 2008, through the date of this decision (20 CFR 404.1520(g)).

Record at 14-21.

In evaluating the medical evidence, the ALJ determined:

. . .[plaintiff] was referred to therapist Amy Vacarro in August of 2010, by her disability attorney. This resulted in a referral to Delco Psychiatric Associates and then to Behavioral Health services. . . . there is no evidence in the file of any such complaint prior to August of 2010. . . . no treating doctor has ever referred her for mental health evaluation or treatment or even noted any symptoms of depression, labile mood, odd affect or cognitive disorder in any records. . . . there is no evidence that it will continue for a period of 12 continuous months. Further, it is also noted that Ms. Vacarro indicated that the [plaintiff] had attended only 4 appointments between August 2010 and December 2010 (Exhibit B-7F).
. . . . .
There is no evidence in the [plaintiff's] file of significant persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements. Nor is there evidence of severe interference with the use of fingers, hands, and arms. No treating physician has provided a diagnosis of CTS. The consultative examiner states "bilateral CTS", based on the reports of the [plaintiff] that she had an EMG, was diagnosed, was given wrists splints, and referred for surgical release of the right wrist.
. . . . .
The [plaintiff] presented to Taylor Hospital on September 29, 2009, with increasing shortness of breath. She was treated with medication and her wheezing improved. She was discharged home with Zithromax (Exhibit B-2F/4). She again presented to Taylor Hospital on October 14, 2009, with complaints of shortness of breath and wheezing despite having used a nebulizer at home since the day before. She was admitted to the hospital and had x-rays, which showed a "mild" reticular interstitial abnormality. Her diagnosis was an exacerbation of her COPD. . . .She was discharged from the hospital on October 20, 2009.

Chest x-rays have shown "mild" COPD, and pulmonary function tests have never been ordered.

. . . . .

Although the [plaintiff] has been treated for asthma, there is no medical evidence to indicate the [plaintiff] suffered asthma attacks at least once every 2 months or 6 times a year.

. . . . .

In October 2006, the [plaintiff] weighed 200 pounds at a height of 67 inches, equating in a BMI of 31.3 (Exhibit B-3F/3).

. . . . .

. . .no physician has attributed any specific work-related limitations to [plaintiff's] obesity. . .

. . . . .

. . . records indicate she has not had an EMG or been referred to surgery for her CTS. . . It is noted that she failed to complete her physical therapy (Exhibit B-8F/22). A lumbar EMG from June 2010, shows no evidence of lumbar radiculopathy or peripheral neuropathy (normal EMG and NCS (Exhibit B-8F/28)). An MRI of her lumbar spine showed no evidence of herniation, and blood tests indicate she was not taking her oxycodone regularly (Exhibit B-8F). . . .At Exhibit B-10F/4, it is noted "no manifestation of any physical discomfort." Although the consultative examiner did note some signs of weakness and gait problems, a physical examination from June 1, 2010, shows that her motor strength in her lower extremities was 4+ (Exhibit B-8F/14).

. , , , ,

As for the opinion evidence, a Department of Public Welfare form was completed on August 18, 2009, indicating that the [plaintiff] would be disabled from that date until April 17, 2010. . . .at the time this form was completed, the [plaintiff] had been seen at ChesPenn Health Services on only 3 occasions (September 5, 2007, May 16, 2009, and August 18, 2009) (Exhibit B-1F).

During the consultative examination, . . . The physical examination revealed tenderness in the thoracic and lumbar spinal regions; motor strength 5/5 in the right upper extremity and 3/5 in the left; wheezing in her lungs; 4/5 motor strength in her right lower extremity, and 3/5 in the left; and a slow and antalgic gait. The doctor's diagnoses were bilateral lumbar radiculitis, bilateral CTS, severe asthma, and visual limitations (Exhibit B-3F).

Record 14-19.

When the ALJ determined that Ms. Scheirer did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, she opined:

Listing sections 1.04 A-C, *Disorders of the Spine*, require that the [plaintiff] have a severe disorder of the spine resulting in compromise of a nerve root or the spinal cord, with evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis. Nerve root

compression must be characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). Spinal arachnoiditis must be confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours. Lumbar spinal stenosis must result in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in an inability to ambulate effectively, as defined in 1.00B2b.

Section 1.00B2b explains the "inability to ambulate effectively" as an "extreme" limitation on the ability to walk, i.e., interferes "very seriously" with the individual's ability to initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device that limits the functioning of both upper extremities. Examples of "ineffective ambulation" include the inability to walk without the use of a walker, two crutches, or two canes, and include the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

The [plaintiff] reported that in 1994, she woke up with low back pain and left lower extremity and went to her private doctor. She alleged that she has had MRIs and an EMG that documented herniated discs. She indicated having participated in physical therapy, but with no real relief. She has been prescribed Flexeril and various pain medications. Over time, her lower back and left lower extremity pain worsened, and then her right lower extremity became involved. She reportedly had 21 epidurals between 1994 and 2002, with only brief relief. In 1996, her left foot started getting numb, and still is currently. Her right foot became numb in 2004. She was given a cane in 2004 because of her altered gait. She still uses it. She alleges that she started falling "a lot" in 2007. She reports having difficulty driving, but can drive short distances. (Note: Despite the [plaintiff's] reports, the first medical evidence of record is dated September 5, 2007. Also, there is no evidence to support that she has had 21 epidural injections.)

The medical evidence does not support that the [plaintiff's] back impairment meets or medically equals the diagnostic criteria of Listing 1.04, or the requirements of Section 1.0B2b.

For the [plaintiff's] CTS, I have considered Listing section 11.14, *peripheral neuropathies*, which requires disorganization of motor function, described in 11.04B as significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements in spite of prescribed treatment. The persistent disorganization of motor function may be in the form of sensory disturbances and the assessment of impairment depends on the degree of interference with the use of fingers, hands, and arms.

The [plaintiff] reports having left carpal tunnel symptoms early in 1994. She had a job that required a lot of typing at work all day. She developed right carpal tunnel syndrome symptoms in 1996, and had an EMG done. She was given splints in 1994, and, although alleges

that surgery was recommended on the right wrist in 1996, she told Dr. Swamy on June 1, 2010, that she had not had an EMG or been referred for surgery (Exhibit B-8F/14). She also alleges that she was advised that her left wrist was "too far gone." She reported needing help with daily activities, in that she cannot wash, and needs eats very slowly and carefully. She indicated that she frequently drops items, and uses plastic flatware so that she will not break her usual utensils. She also reported that cooking is very difficult for her.

There is no evidence in the [plaintiff's] file of significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements. Nor is there evidence of severe interference with the use of fingers, hands, and arms. No treating physician has provided a diagnosis of CTS. The consultative examiner states "bilateral CTS", based on the reports of the [plaintiff] that she had an EMG, was diagnosed, was given wrists splints, and referred for surgical release of the right wrist. According, I find that the [plaintiff's] carpal tunnel syndrome does not meet or equal in severity the criteria for Listing section 11.14 in Appendix 1.

Section 1.00B2c explains the "inability to perform gross and fine movements effectively" as an "extreme loss of function of both upper extremities," i.e., an impairment that interferes "very seriously" with the individual's ability to independently initiate, sustain, and complete activities of daily living which require reaching, pushing, pulling, grasping, and fingering. Examples of such inability to perform gross and fine movements include the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place papers in files in a file cabinet at or above waist level.

Again, there is no medical evidence to support that the [plaintiff] is unable to perform the activities listed in Section 1.00B2c.

With respect to her COPD, I have considered Listings 3.03A and 3.03B in Appendix 1, which specifies the conclusive disability standards for asthma impairments. Listing 3.03A requires a diagnosis of chronic asthmatic bronchitis, which is to be evaluated under the criteria for chronic obstructive pulmonary disease in 3.02A, with FEV1 values equal to or less than those in Table I corresponding to an individual's height.

The [plaintiff] presented to Taylor Hospital on September 29, 2009, with increasing shortness of breath. She was treated with medication and her wheezing improved. She was discharged home with Zithromax (Exhibit B-2F/4). She again presented to Taylor Hospital on October 14, 2009, with complaints of shortness of breath and wheezing despite having used a nebulizer at home since the day before. She was admitted to the hospital and had x-rays, which showed a "mild" reticular interstitial abnormality. Her diagnosis was an exacerbation of her COPD. During the hospitalization, she was advised (once again) to stop smoking, her response was that she had no intention of quitting smoking and that she did not believe that her COPD resulted from her smoking. She was discharged from the hospital on October 20, 2009 (Exhibit B-4F).

Chest x-rays have shown "mild" COPD, and pulmonary function tests have never been ordered. For an individual of the [plaintiff's] height, 67 inches, Table I requires an FEV1 of 1.35 or less to meet Listing 3.02. However, given the absence of pulmonary function tests, the [plaintiff's] asthma cannot be deemed to meet or equal Listing 3.02A-B in Appendix 1.

Alternatively, Listing 3.03B is satisfied if the individual experiences asthma "attacks" (as defined in section 3.00C of Appendix 1), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least 6 times a year. Although the [plaintiff] has been treated for asthma, there is no medical evidence to indicate the [plaintiff] suffered asthma attacks at least once every 2 months or 6 times a year. Accordingly, I find the [plaintiff's] asthma does not satisfy Listing 3.03B in Appendix 1.

Social Security Ruling 02-1p requires Administrative Law Judges to consider obesity in determining whether claimants have medically determinable impairments that are severe, whether those impairments meet or equal any listing, and finally in determining the residual functional capacity. According the Clinical Guidelines issued by The National Institutes of Health, an individual is "obese" if their body mass index (BMI) is 30.0 or above. BMI is the ratio of an individual's weight in kilograms to the square of her height in meters (kg/m2). In October 2006, the [plaintiff] weighed 200 pounds at a height of 67 inches, equating in a BMI of 31.3 (Exhibit B-3F/3).

Although no physician has attributed any specific work-related limitations to [plaintiff's] obesity, the [plaintiff] has reported shortness of breath, difficulty walking, and back pain, all of which could be exacerbated by severe obesity. As indicated in SSR 02-1p, obesity may have an adverse impact upon co-existing impairments. For example, obesity may affect the respiratory system, making it harder for the chest and lungs to expand and imposing a greater burden upon the heart. Someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from arthritis alone. I have taken these considerations into account in reaching the conclusions herein.

Record at 15-17.

Because she found that Ms. Scheirer's impairments did not equal or meet the requirements of a Listing, the ALJ then determined whether or not Plaintiff retained the RFC to perform her past relevant work or other work existing in significant numbers in the national economy. After careful consideration of the record, the ALJ found Ms. Scheirer to be unable to perform any past relevant work. Record at 19-20. However, the ALJ determined that Plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a), "except she can lift and carry 10 pounds occasionally, lift and carry 2 to 3 pounds frequently, standing or walking a total

of 2 hours and sitting 6 in an 8 hour day, no exposure to concentrated levels of dust, fumes, gasses or other pulmonary irritants or extremes of temperature, no more than frequent fingering or handling with the right dominant hand, occasional fingering and handling with the left". Record at 17. In determining Ms. Scheirer's RFC, the ALJ considered the following:

In making this finding, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. I have also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the [plaintiff's] symptoms, I must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the [plaintiff's] pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce [plaintiff's] pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the [plaintiff's] symptoms to determine the extent to which they limit the [plaintiff's] functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must make a finding on the credibility of the statements based on a consideration of the entire case record.

The [plaintiff] appeared at the hearing on her 49th birthday. She is 5'7" tall and weighs 200 pounds. She has a driver's license and testified that she is able to drive although she has no car. She last worked at the Media Courthouse as a data entry clerk and was terminated for forging a doctor's note. She denies having done so and stated it was a big misunderstanding. She looked for work after that and tried waiting tables, but her back prevented her from doing that work. She can walk a block, cannot stand long or sit long enough to watch an entire TV show. She says that she was told by a doctor in 1998 to not lift more than 10 pounds. She currently sees Dr. Swami, her pain management doctor, most frequently, and testified she is attending physical therapy. Her boyfriend helps her with personal care "from time to time" and she has trouble with buttons and zippers, combing her hair, and putting on shoes. She has a nebulizer machine at home. Her neighbor walks her dog and does her shopping. Her back pain is constant and she uses a cane for balance. Her medications are not effective and physical therapy makes her pain worse. She gets no more than 1 ½ hours of sleep per night. She reports having CTS in both hands, the left worse than the right. She claims that she had an EMG in 1999 (not in file) and was told her left wrist was "too far gone" for surgery. As noted earlier in this decision, in June of 2010, records indicate she has not had an EMG or been referred to surgery for her CTD. Strength in the left leg is out of proportion to findings on MRI. It is noted that she failed to complete her physical therapy (Exhibit B-8F/22). A lumbar EMG from June 2010, shows no evidence of

lumbar radiculopathy or peripheral neuropathy (normal EMG and NCS (Exhibit B-8F/28)). An MRI of her lumbar spine showed no evidence of herniation, and blood tests indicate she was not taking her oxycodone regularly (Exhibit B-8F). Her complaints of pain are generally extreme, especially to the findings on imaging. At Exhibit B-10F/4, it is noted "no manifestation of any physical discomfort." Although the consultative examiner did note some signs of weakness and gait problems, a physical examination from June 1, 2010, shows that her motor strength in her lower extremities was 4+ (Exhibit B-8F/13). Despite her COPD, she continues to smoke 10 cigarettes a day.

After careful consideration of the evidence, I find that the [plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The [plaintiff's] daily activities do not indicate that she would be unable to function in the work place on a regular basis and her complaints are only partially credible. There is no supported medical opinion evidence corroborating the [plaintiff's] contention that she suffers from severe limitations precluding her from work. Accordingly, I find the [plaintiff] has the above defined residual functional capacity.

As for the opinion evidence, a Department of Public Welfare form was completed on August 18, 2009, indicating that the [plaintiff] would be disabled from that date until April 17, 2010. This assessment was provided to the Pennsylvania Department of Public Welfare, and in this regard, Social Security regulations provide that a decision by any non-governmental agency or governmental agency (i.e., that an individual is disabled) would be based on its own rules; that if a decision by another agency were to be made that a claimant is disabled, or is unable to work, that decision is not binding on the Social Security Administration (20 C.F.R. §404.1504 and §416.904); and that for the purposes of determining a claimant's eligibility to receive Disability Insurance Benefits and/or Supplemental Security Income payments, a finding as to whether a claimant is disabled or not disabled is based solely on the Social Security Act, rules, and regulations. The projection of disability 8 months into the future is not accepted. Further, the issue of disability is reserved to the Commissioner. And finally, at the time this form was completed, the [plaintiff] had been seen at ChesPenn Health Services on only 3 occasions (September 5, 2007, May 16, 2009, and August 18, 2009) (Exhibit B-1F).

During the consultative examination, the [plaintiff] reported low back pain, degenerative disc disease, herniated discs, sciatica with numbness in her left foot, numbness in her right foot, asthma, and bilateral CTS. She alleged that she had diagnostic testing that confirmed her herniated discs, and CTS. She reported that she used a nebulizer in the past for her asthma, but currently was taking Advair, Albuterol, and Nasonex. She reported that her pain level was "an 11 on a scale to 10", with her worst day being a "15", and her best day being a "9". The physical examination revealed tenderness in the thoracic and lumbar spinal regions; motor strength 5/5 in the right upper extremity and 3/5 in the left; wheezing in her lungs; 4/5 motor strength in her right lower extremity, and 3/5 in the left; and a slow and antalgic gait. The doctor's diagnoses were bilateral lumbar radiculitis, bilateral CTS, severe asthma, and visual limitations (Exhibit B-

3F). I do not give any weight to this opinion as it is based on the [plaintiff's] subjective complaints.

The State agency medical consultant's opinion at Exhibit B-5F, finding that the [plaintiff] is capable of performing the full range of light exertional level work, is given no weight as the evidence of record supports that the [plaintiff] is more limited than found by this consultant.

Record at 18-19. The ALJ concluded that, considering Ms. Scheirer's age, education, work experience and her RFC, there were jobs that exist in significant numbers in the national economy that she could perform. Record at 20.

Present at the Hearing was VE Sherry L. Kristal-Turetsky. The ALJ asked her whether jobs exist in the national economy for an individual with Ms. Scheirer's age, education, work experience and RFC.

In determining whether a successful adjustment to other work can be made, I must consider the [plaintiff's] residual functional capacity, age, education, and work experience in conjunction with the Medical–Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the [plaintiff] can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the [plaintiff's] specific vocational profile (SSR 83-11). When the [plaintiff] cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the [plaintiff] has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisonmaking(SSR 85-15).

If the [plaintiff] had the residual functional capacity to perform the full range of sedentary work, a finding of "not disabled" would be directed by Medical–Vocational Rule 201.21. However, the [plaintiff's] ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled sedentary occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with the [plaintiff's] age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as:

●a call out clerk – for which there are 65,000 jobs nationally and 450 regionally;
●a document preparer – for which there are 120,000 jobs nationally and 800 regionally;
●an information clerk – for which there are 75,000 jobs nationally and 1,000 regionally; and

●a surveillance system monitor – for which there are 50,000 jobs nationally and 600 regionally

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert I conclude that, considering the [plaintiff's] age, education, work experience, and residual functional capacity, the [plaintiff] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

Record at 20-21. Ms. Scheirer was not found to have been under a disability from November 23, 2008, through the date of the ALJ's decision. Record at 21.


## V.    DISCUSSION

Plaintiff argues that the ALJ's ruling that Plaintiff does not have a severe mental impairment is not supported by substantial evidence and represents a reversible and harmful error law. She also claims that the ALJ committed a reversible error of law by failing to impose any mental limitations as part of the RFC assessment and in failing to include mental limitations in her questioning of the VE. Additionally, Plaintiff asserts that the ALJ committed a reversible error of law by failing to conduct a thorough inquiry into the types and levels of job stresses involved in the jobs identified by the VE. Finally, Plaintiff alleges that the ALJ's failure to accord sufficient weight to the medical source statement completed by Michael A. Kennedy, M.D. is not supported by substantial evidence and represents a reversible and harmful error of law. Plaintiff's Brief at 4-18.

A.  **<u>Mental Impairment</u>**

Ms. Scheirer claims that the ALJ's finding that she does not suffer from a severe mental impairment is not supported by substantial evidence and represents a reversible and harmful error of law.

At Step Two of the sequential evaluation process, the ALJ must determine whether a claimant has a severe impairment or combination of impairments. 20 C.F.R. §404.1520(a)(4)(ii). Three requirements must be met: the claimant must prove that she has a medically determinable impairment or combination of impairments; the claimant must prove that her medically determinable impairment or combination of impairments is severe; the claimant must prove that her severe medically determinable impairment or combination of impairments meets the durational requirement of the Act. 20 C.F.R. §404.1520(a)(4)(ii). An impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques". 20 C.F.R. §404.1508. Furthermore, an impairment is severe only if it significantly affects a claimant's ability to perform basic work activities. 20 C.F.R. §404.1521(a). Finally, one's impairment or combination of impairments must be expected to result in death or it must have lasted or must be expected to last for a continuous period of twelve months. 20 C.F.R. §404.1509.  In determining the severity of mental impairments, the ALJ should rate the degree of limitation arising from this impairment with regard to four areas of functioning: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. 20 C.F.R. §404.1520a(c)(3). If the mental impairment results in no limitation or a mild limitation in the first three of these domains, the ALJ should generally conclude that the claimant has failed to prove a severe mental impairment or combination of impairments. 20 C.F.R. §404.1520a(d)(1).

The ALJ found in this matter that Ms. Scheirer does indeed suffer from a number of severe impairments, and she clearly states why mental impairments are not included among them.

Although the [plaintiff] also alleges depression and a cognitive disorder, I note that she was referred to therapist Amy Vacarro in August of 2010, by her disability attorney. This resulted in a referral to Delco Psychiatric Associates and then to Behavioral Health services. Although the [plaintiff] has provided a history of long-term depression, there is no evidence in the file of any such complaint prior to August of 2010. Not only is it not alleged in the disability or function report, (Exhibits B3E and B5E), no treating doctor has ever referred her for mental health evaluation or treatment or even noted any symptoms of depression, labile mood, odd affect or cognitive disorder in any records. Assuming that developed in August of 2010, (and taking note that the [plaintiff] appointed attorney Shivers as her representative in this matter on August 6, 2010) there is no evidence that it will continue for a period of 12 continuous months. Further, it is also noted that Ms. Vacarro indicated that the [plaintiff] had attended only 4 appointments between August 2010 and December 2010 (Exhibit B-7F). Therefore, the opinions offered by Ms. Vacarro, the opinion from 2 visits with Delco Psychiatric Associates (Exhibit B-9F), and the opinion from one psychological evaluation at Behavioral Health Services on November 22, 2010, are given no weight. Consequently, the [plaintiff's] alleged mental impairments are not considered to be "severe" pursuant to the regulations, and will not be considered in this decision.

Record at 14-15.

Though Plaintiff noted in her Function Report-Adult dated August 28, 2009, that she was referred to a psychologist/psychiatrist, it was to help her cope with pain, not due to depression or a cognitive disorder. She stated that she would go to see a psychologist/psychiatrist when she "can get some insurance". Record at 129-138. It is also of note that the difficulty she mentioned in regard to watching television and reading is because she cannot sit still for a long period of time, not because she does not understand what she is watching or reading.

Before Ms. Scheirer's attorney referred her to a mental health specialist, none of Plaintiff's doctors had suggested that she get a mental health evaluation or treatment for a mental disorder. Even after the referral, Plaintiff's records do not reveal a mental health diagnosis from Ms. Scheirer's long-term treating doctors. Record at 53, 157, 195, 196, 197, 198, 199-200, 201,

220-221, 222, 223, 224, 225, 227, 228, 229-230, 231, 232, 233-234, 235-239, 240. The Taylor Hospital Emergency Room Record dated September 29, 2009, indicates that when Plaintiff arrived in the ER, she was oriented X3, with normal affect and normal concentration.. Her ER visit was due to an exacerbation of her COPD. Record at 158-165. Similarly, when she returned to Taylor Hospital on October 14, 2009, there was no mention of mental distress or impairment. Record at 180-181, 182-183. There is no documentation that would indicate that Ms. Scheirer experienced the long-term depression which she alleges.

As previously stated, it was in August, 2010, that Plaintiff first submitted to mental health evaluation and treatment, at the behest of her attorney. Therapist Amy Vaccaro, LCSW indicated that she saw Ms. Scheirer for a total of four appointments from August to December, 2010. Record at 214-217. During this time period, Plaintiff also was treated and evaluated by Ulhas Mayekar, M.D., seeing him for two appointments, during which an antidepressant was prescribed, followed up by a medication check. Record at 252-255. In November, 2010, Ms. Scheirer was sent to Behavior Health Services for a psychological evaluation performed by Joseph S. Puleo, Jr., Ph.D. Record at 256-270.

At Plaintiff's initial visit with Ms Vaccaro, Plaintiff's subjective complaints were noted and recorded. Individual psychotherapy on a weekly basis was recommended, with possible collateral sessions with both Ms. Scheirer and her boyfriend. Record at 215- 217. Ms. Vaccaro referred Plaintiff to Dr. Mayekar. During her initial appointment with him, though appearing unkempt, Ms. Scheirer was alert and oriented to person, place or time X3; her speech was fluent. She experienced no delusions or hallucinations. Her thought content was normal and appropriate. No suicidal ideations or homicidal thoughts were present . She showed no evidence of recent or remote memory impairment, and she displayed fair insight and judgment. Record at 252-253. At

a follow-up, and final, visit, Plaintiff reported feeling better. The motoric behavior was noted as "psychomotor normal". Again, she was alert and oriented to person, place and time X3 – Her speech was fluent, and she experienced no delusions or hallucinations. Thought content was normal and appropriate. No suicidal ideations or homicidal thoughts were present. She showed no evidence of recent or remote memory impairment, and she displayed fair insight and judgment. Dr. Mayekar did not indicate that Plaintiff had a cognitive disorder; he merely prescribed an anti-depressant and told Ms. Scheirer to return in a week so he could monitor her response to the medication. Record at 252-255. Neither Ms. Vaccaro nor Dr. Mayekar stated that Plaintiff could not work. In the evaluation done by Dr. Puleo, Plaintiff underwent a number of tests, whose results revealed that Ms. Scheirer functioned in the low average of general intelligence. Though she had a significantly lower overall ability regarding auditory verbal comprehension, her functioning in perceptual reasoning, working memory and processing speed proved to be average. One test suggested an organic disorder; however, further neuropsychological testing to confirm this was not performed. Math and reading scores indicated that she did not have a specific leaning disorder. Personality testing suggested that she was a highly dependent person. Dr. Puleo further found that it was unclear whether Plaintiff's claim of hearing her deceased father's voice was actually a hallucination. Ms. Scheirer relayed her thoughts and ideas in a logical, goal-oriented manner, and she displayed no signs of looseness of association. Dr. Puleo determined, however, a number of restrictions in Plaintiff's ability to work. Record at 214-217.

The ALJ afforded the above opinions no weight. Record at 14-15. Ms. Scherier feels that the ALJ failed to adequately evaluate the findings of these professionals, particularly Dr. Puleo. On the contrary, the ALJ sufficiently explained why she accorded the opinions of Ms. Vacarro

and Dr. Puleo no weight. Record at 14-15. As previously noted, no treating sources had found it necessary to refer Ms. Scherier for a mental evaluation or treatment or had even reported any symptoms of such an impairment. It was Plaintiff's attorney who referred her to mental health professionals for an evaluation and treatment. Clearly substantial evidence supports the ALJ's determination that Plaintiff did not suffer from a severe mental impairment.

B. **RFC Assessment/ VE Questioning**

Ms. Scheirer next claims that the ALJ committed a reversible error of law by failing to impose any mental limitations as part of her RFC assessment and in failing to include mental limitations in her questioning of the VE. Plaintiff's Brief at 12-13.

The ALJ determined that Ms. Scheirer retained the RFC to perform sedentary work. By way of further explanation, she found that Plaintiff could lift and carry ten pounds occasionally, lift and carry two to three pounds frequently, standing or walking a total of two hours and sitting six hours in an eight-hour day, no exposure to concentrated levels of dust, fumes, gasses or other pulmonary irritants or extremes of temperature, no more than frequent fingering or handling with the right dominant hand, occasional fingering and handling with the left. Record at 17. As noted above, Ms. Scheirer's alleged mental impairments "are not considered to be 'severe' pursuant to the regulations, and will not be considered in this decision". Record at 15.

Plaintiff was referred to her therapist, Ms. Vacarro, in August, 2010, by her attorney, not a treating source. There is no evidence in the record of any complaint of mental impairment until that time. No mental impairment is alleged by Ms. Scheirer in the disability and function reports she submitted to the Commissioner. Record at 118-121; 122-128; 129-136; 139-141; 142-148. Though Plaintiff states in a Supplemental Function Questionnaire that she had been referred to a psychologist/psychiatrist to help cope with her pain, she does not include the name, address and

telephone number of the doctor and the dates of her treatment. She merely says that she will go when she can get some insurance. Record at 138. No treating doctor has ever referred her for mental health evaluation or treatment nor has any doctor noted any symptoms of mental impairment. Record at 155; 158-165; 180-181; 182-183; 195-196;197; 198; 199-200; 201; 220-221; 222; 223; 224; 225; 227; 228; 229-230; 231; 232; 233-234; 235-239; 240. Given that the record reveals that no treating source had felt the need to refer Ms. Scheirer for a mental health evaluation or treatment or had even reported symptoms of a mental impairment, substantial evidence supports the ALJ's exclusion of any mental limitations in Plaintiff's RFC assessment.

In questioning the VE concerning jobs that Ms. Scheirer could perform in the national economy, the ALJ asked "whether jobs exist in the national economy for an individual with the [plaintiff's] age, education, work experience, and residual functional capacity".[9] Record at 20.

---

[9] The testimony reads as follows:

Q If you had a hypothetical person the same age, education and background as the [plaintiff] who is limited to work at the light exertional level with no concentrated exposure to dust, fumes, gases or other extremes of temperature or other pulmonary irritants – is such a person able to perform the [plaintiff's] past work?

A Certainly, the work of a data entry clerk and a bookkeeper. And actually the waitress as well.

Q Okay. If you had a hypothetical person who is limited to work at the sedentary exertional level, which would be lifting up to ten pounds occasionally, two to three pounds frequently, standing and walking no more than two hours in an eight-hour day and sitting six with no exposure again to concentrated levels of dust, fumes, gases, other pulmonary irritants or extremes of temperature – would such a person be able to perform any of the [plaintiff's] past work or other work that exists?

A Data entry clerk as it may be performed in the national economy and certainly other work as well.

Q Okay. Can you give me some examples of other jobs?

A Are we working with just the sedentary or sedentary and light?

Q Just sedentary.

A We have the work of a charge account clerk, which is sedentary and unskilled, nationally 35,000, regionally 400; the work of a call out clerk, which sedentary and unskilled, nationally 65,000, regionally 450; and the work of document preparation, microfilming, sedentary, unskilled, nationally 120,000 and regionally 800.

Counsel for Ms. Scheirer then questioned the VE, mentioning the psychological evaluations in the record. The ALJ indicated that she would take under advisement Plaintiff's argument that she suffers from both physical and emotional limitations.  Record at 42-43.

Having noted the evidence in the record concerning Ms. Scheirer's alleged cognitive disorder and depression, or lack thereof, the ALJ determined that Plaintiff's alleged mental impairments would not be considered in her decision. Substantial evidence supports this finding, along with the ALJ's exclusion of mental impairments in her discussion with the VE.

---

Q Okay. Now, if our hypothetical person, in addition to those limitations in hypothetical two, we add in no more than frequent fingering or handling with the right dominant hand and only occasional fingering or handling with the left – would such a person be able to perform the jobs you just identified?

A If the only limitation is on fingering, such an individual could perform the work of a file clerk. *The Dictionary of Occupational Titles* does not deny that reference is right for fingering. It's just stated occasional frequent and (INAUDIBLE). I don't see that it would be – I don't see why such an individual could not perform the work with document preparer and microfilming as well. Charge account clerk is more frequent fingering, and I think it's safer to assume that that could be bilateral.

Q Okay.

A So, I would eliminate charge account clerk for that reason.

Q Are there any other jobs that fit that third hypothetical?

A Yes.

Q That you haven't identified?

A Yes, there  are. There would be the work of an information clerk, which can be performed at sedentary or light, with a sit-stand or optional (INAUDIBLE) base, which is why it could be either sedentary or light and is classified at the light exertional level. It is unskilled and my statement as to the fact that it can be performed sedentary or light, differs from the *DOT* based on professional experience and observation in performing on-site job analyses and labor market research. And nationally that would be 75,000 and regionally 1,000 for the information clerk; and also the work of a surveillance system monitor, which is sedentary, unskilled, nationally 50,000 and regionally 600.

Q Okay. Now, did you have a chance to look at the Medical Source Statement attached to Michael Kennedy's consultative exam, which is B3F in the record?

A. It's less than full-time.

Q Okay. That was my question.

Record at 39-42.

C.  **Job Stresses**

Plaintiff further claims that the ALJ committed a reversible error of law by failing to conduct a thorough inquiry into the types and levels of job stresses involved in the jobs identified by the VE. Plaintiff's Brief at 13-15. It is Plaintiff's continuing burden to show by appropriate medical means that he or she is disabled. *See Torres v. Schweiker,* 682 F.2d 109, 111 (3d. Cir. 1982). The record does not reveal that Ms. Scheirer suffers from an impairment-related limitation due to stress. There is no medical evidence that she has difficulty dealing with stress on an ongoing basis. Again, as noted above, Ms. Scheirer did not begin treatment for mental health issues until it was suggested by her attorney. Even if the ALJ were to consider the information received from Plaintiff's mental health specialists, she would not find that Ms. Scheirer's response to stress would prevent her from working. Her ER visits were for respiratory difficulties. Record at 158-165; 180-183. Due to transportation difficulties, Plaintiff only saw Ms. Vaccaro four times. Record at 215-217. After noting Ms. Scheirer's improvement after a week on medication, Dr. Mayekar asked that she return in five weeks. Record at 254-255.

The record does not establish that Plaintiff had an impairment-related limitation due to stress. Substantial evidence supports the ALJ's lack of discussion concerning Ms. Scheirer's alleged response to stress.

D.  **Dr. Kennedy's Report**

Plaintiff next alleges that the ALJ's failure to accord sufficient weight to the Medical Source Statement completed by Michael A. Kennedy, M.D., is not supported by substantial evidence and represents a reversible and harmful error of law. Plaintiff's Brief at 15-18. In regard to Dr. Kennedy's statement, the ALJ determined:

During the consultative examination, the [plaintiff] reported low back pain, degenerative disc disease, herniated discs, sciatica with numbness in her left foot, numbness in her right foot,

asthma, and bilateral CTS. She alleged that she had diagnostic testing that confirmed her herniated discs, and CTS. She reported that she used a nebulizer in the past for her asthma, but currently was taking Advair, Albuterol, and Nasonex. She reported that her pain level was "an 11 on a scale to 10", with her worst day being a "15", and her best day being a "9". The physical examination revealed tenderness in the thoracic and lumbar spinal regions; motor strength 5/5 in the right upper extremity and 3/5 in the left; wheezing in her lungs; 4/5 motor strength in her right lower extremity, and 3/5 in the left; and a slow and antalgic gait. The doctor's diagnoses were bilateral lumbar radiculitis, bilateral CTS, severe asthma, and visual limitations (Exhibit B-3F). I do not give any weight to this opinion as it is based on the [plaintiff's] subjective complaints.

Record at 19.

It is the ALJ who determines what weight should be accorded to the medical opinions of record. 20 C.F.R. §404.1527; *see also Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). A reviewing court is not empowered by the statute to determine what weight should be accorded to the various medical opinions of record. *Richardson v. Perales,* 402 U.S. 389, 399 (1971); *Monsour,* 806 F.2d at 1190 (3d Cir. 1986).

In Dr. Kennedy's examination of Ms. Scheirer he indicates that no medical information had been sent for review; however, he did send Plaintiff for x-rays after the exam. In his analysis, Dr. Kennedy diagnosed Ms. Scheirer with bilateral lumbar radiculitis (L5-S1), bilateral CTS, severe asthma, and visual limitations. He noted that "she does have significant limitations that do not appear to show any sign of improvement in the near future". Record at 166-179. Nonetheless, the mere presence of a condition does not permit a finding of disability; it must show a work-related functional loss. *In re Petition of Sullivan,* 904 F.2d 826, 845 (3d Cir. 1990); *Foley v. Comm'r. of Social Security*, 349 Fed. Appx. 805, 808 (3d Cir. 2009).

Ms. Scheirer complained to Dr. Kennedy of low back pain and left leg pain which began in 1994, and she reported on her Supplemental Function Questionnaire that the pain began in 1995. Record at 137-138; 166. Nonetheless, the first mention of such pain is in 2009. Record at 156. Plaintiff also indicated to Dr. Kennedy that she had had 21 epidudrals between 1994 and

2002, with only brief relief. Record at 166. Reference to these epidurals is only made by Ms. Scheirer; there are no medical records in evidence to corroborate this information. Record at 166-171; 199-200; 233-234.

Plaintiff also told Dr. Kennedy of her history of disc herniation and sciatica. An x-ray of her lumbar spine, dated October 5, 2009, does reveal degenerative changes; however, the findings read: mild loss of disc height at L3/L4 and L5/S1; osteophytic spurring of the endplates at L3/L4; normal vertebral body heights; anatomic alignment; facet osteoarthritis at L3/L4, L4/L5, and L5/S1, and mild calcification of the abdominal aorta. Record at 174. In her ER visit in the same month, a physical examination of Plaintiff's back showed mild thoracic kyphosis and no costovertebral angle tenderness. There was no gross focal motor or sensorial deficit, and muscle strength of 5/5 in all four extremities. Examination of the extremities showed no edema, cellulitis or cyanosis, fair range of motion in all joints with some tenderness of straight leg raising on the left side. Record at 183. An EMG prescribed on June 1, 2010, proved to be normal, with no evidence for lumbar radiculopathy or peripheral neuropathy. Record at 246-247. In a letter from Priya Swamy, M.D. to Raquibul Islam, M.D., Dr. Swamy noted Plaintiff's motor strength to be 5/5 in the upper extremities and 4+ in the lower extremities. "For dorsiflexion and plantar flexion in the right leg she does not give much effort but the strength is there." She has a positive straight leg raise test on the left. Physical therapy was recommended. Record at 199-200; 233-234. An MRI in June, 2010, found no disc protrusion or spinal stenosis at L1/L2 or L2/L3, of L4/L5; a slight annular bulge with endplate osteophyte formation at L3/L4, with no central or neural foraminal stenosis. At L5/S1 there was moderate loss of T2-weighted disc space signal intensity; annular bulge with endplate osteophyte formation; central disc protrusion contacts but does not compress the S1 nerve roots in the subarticular recesses. There was

bilateral facet joint hypertrophy, and no central or neural foraminal stenosis. "Conus medullaris: Terminates at the L1 level and shows no signal abnormality. Cauda equine: No abnormality identified. Marrow: No abnormality identified." Record at 248-249. On June 29, 2010, after examining Plaintiff, Dr. Swamy reported that her motor strength was 5/5 in both the upper extremities and right lower extremity. In the left lower extremity, it was 3+4/5. He further stated that "[t]he strength that she gives in the left leg is out of proportion to her findings on MRI". Record at 231. A month later a physical exam revealed 5/5 in the upper extremities, with 4/5 on the left side with possibly 3+ on dorsiflexion and plantar flexion. The right side was 5/5. Record at 198, 227, 228, 228-230. Dr Swamy noted in September, 2010, that Ms. Scheirer's left hip flexors and quads were 3+ out of 5, as well as plantar flexion and dorsiflexion. Record at 222, 223, 224. Disc herniation and sciatica were not discussed as problems in his correspondence or in his progress notes, nor was CTS.

In the Physical RFC Assessment completed by Carla Huitt, M.D. on November 9, 2009, Dr. Huitt reviewed the evidence of record and compared it with Dr. Kennedy's opinion:

The [plaintiff] alleges disability due to degenerative disc, sciatic nerve left leg, carpal tunnel, asthma and hearing. She reports pain. She alleges that these symptoms result in limitations in standing, walking, lifting, carrying, bending, sitting, pushing, pulling, climbing, balancing, stooping, kneeling, crouching, crawling, squatting, reaching, using her hands, thinking, concentrating, remembering, performing at a consistent pace, completing daily activities and hearing, talking, seeing, understanding, following instructions, getting along with others. The medical evidence establishes a medically determinable impairment of Obesity, Mild DDD/DJD Lumbar Spine, Mild COPD.

[Plaintiff] is 47 year old female with physical allegations of degenerative disc, sciatic nerve left leg, carpal tunnel, asthma and hearing. There have been prior filings w/ most recent denial at the ALJ level 11/20/08. There has been limited treatment since the ALJ decision. FO-no physical limitation noted and no problems w/ hearing and communicating. NO MENTION of CANE. Therefore the allegation of hearing problem is considered minimal. There are no records of significant number of repeated physician interventions regarding asthma therefore the allegation of asthma is considered minimal.

5/16/09 PCP for cough for 2 weeks. Noted to weigh 201 pounds. There were rhonci sounds in lungs but no wheezes. 8/18/09 presents to PCP to have him sign the Medical Assistance form. Exam was normal other than some rhonci being noted on lung exam. (This is a "normal" breath sound heard on smoker's lungs when auscultated.)

10/3/09 CE physical-She drove herself to exam. She says she was admitted to hospital 2 days ago but signed out AMA (against medical advice) because she needed to keep this disability appointment. (SSA has been unable to confirm this and obtain the medical records for independent review of 10/1/09 admission. There was ER visit for wheezing that significant improved after single Albuterol treatment and there was no indication of impending admission. She says her current pain is 11 out of 10 and that her worse pain is 15/10 point scale. (this is not creditable). The pain diagram shows that her entire body is painful. Ht. 67 inches and Wt. 200 pounds. Became emotionally labile during exam. Strength 5/5 right and 3/5 left upper extremity. Plamar atrophy noted bilaterally. Demonstrated 4/5 strength right leg and 3/5 left leg. She walked very slowly w/ cane. [Plaintiff] went on to demonstrate inability to tolerate supine SLR and very limited seated SLR to 30 degrees w/ complaints of back pain. (This is negative SLR test). She also demonstrated very limited ROM of nearly all the joints and was unable to oppose her thumb to her 5th fingers. This exam, in the face of normal musculoskeletal exam in the hospital and normal exam with IP consultation 10 days later, no limitations at PCP as well as no physical limitations observed FO this CE, is considered completely NOT CREDITABLE.

10/14 to 10/20/09 IP presents for SOB. Noted in ER to ambulate w/ normal steady gait into treatment room and no mention of cane. Noted to be current smoker and has had no intentions to quit smoking as the [plaintiff] does not believe smoking is the cause of her problems. She lives alone and smokes a pack cigarettes per day. There is history of alcohol abuse in the past. See complete physical for admission with 5/5 strength and normal gait. SLR is said to be tender on the left. Noted to have some thoracic hyphosis, X-ray lumbar spine w/ mild loss of disc height L3-4 and L5-S1 and some osteophytic spurring.

ADLs-rents a house, other MER indicates she loves alone. She has a dog and alleges gets help from neighbor for care of dog, washing her hair and shaving her legs and arm pits. Fixes simple meals, does dishes and laundry. She alleges she does not drive but was noted at CE to drive herself. Alleges can only lift a pint of milk and walk ½ block. She alleges using cane, but was only observed using cane at physical CE. She alleges using Flexeril and Darvocet for pain, but [plaintiff] has not provided SSA with treating sources who prescribe the medication she alleges taking. The PCP only prescribed Tylenol w/codeine and some respiratory medication.

. . . . .

The [plaintiff] has provided inconsistent information regarding her daily activities. She describes the ability to care for dog in the home. Furthermore, she has alleged performing few, if any, household chores. However, the overall evidence suggests that she has the ability to care for herself and maintain her home. She is able to drive a car. She has pursued appropriate follow-up care for her impairments. The treatment for her impairments has been essentially routine and conservative in nature. Additionally, she does not attend physical therapy. She does not require an assistive device to ambulate. Moreover, she does not use a Tens unit. Despite allegations of persistent symptoms, there have been significant periods of time during which she has not taken medication for those symptoms. The record reflects that she has made inconsistent statements

relating to her alleged disabling impairments. Inconsistencies in the information provided by her may not be the result of a conscious intention to mislead, but such inconsistencies suggest that this information may not be reliable. There is evidence that she was less than fully cooperative during the examination. There is evidence that her efforts during testing were less than maximal.

. . . . .

The opinion stated within the report received 11/6/2009 provided by Michael A. Kennedy, M.D., a nontreating source, has been considered. The residual functional capacity assessment is different than the opinions expressed by Michael A. Kennedy, M.D., in the report received 11/6/2009 due to inconsistencies with the totality of the evidence in file. Some of the opinions cited in the report are viewed as an overestimate of the severity of the [plaintiff's] functional restrictions. The nontreating source states in the report that the [plaintiff] is limited in standing, walking, sitting, pushing, pulling, bending, kneeling, stooping, crouching, balancing, climbing, reaching, handling, fingering, and feeling and that she should avoid exposure to heights. These observations are not consistent with all of the medical and non-medical evidence in the claims folder. The evidence provided by the examining source reveals only a snapshot of the [plaintiff's] functioning and is an overestimate of the severity of her limitations. Therefore, great weight cannot be given to the examining source's opinion. The physician's opinion contrasts sharply with other evidence in the record, which renders it less persuasive. The physician's opinion is without substantial support from the other evidence of record, which renders it less persuasive. Finally, the report submitted by Michael A, Kennedy, M.d., received 11/6/09, is given appropriate weight in this assessment.

Record at 189-190 (emphasis in original).

Dr. Kennedy's opinion appears to be supported by Plaintiff's subjective report to him at the time of the consultative examination; however, it contrasts with the other objective evidence of record. The record indicates that the ALJ properly considered Dr. Kennedy's opinion, as well as the rest of the evidence of record, and she clearly explained in her decision why she could not give this opinion probative weight. Substantive evidence supports this determination.

E. **Disability**

Finally, Ms. Scheirer claims that the Commissioner's finding that she is not disabled is not supported by substantial evidence. Plaintiff's Brief at 18.

Plaintiff simply disputes the ALJ's finding that she is not disabled. For all the reasons set forth above, I find substantial evidence to support the ALJ's determination that Ms. Scheirer was not disabled from November 23, 2008, through the date of her decision.

## RECOMMENDATION

Consistent with the above discussion, it is recommended that the Plaintiff's Motion for Summary Judgment or, in the Alternative, Plaintiff's Motion for Remand, be DENIED and that judgment be entered in favor of Defendant.[10]


BY THE COURT:


S/M. FAITH ANGELL _____
M. FAITH ANGELL
UNITED STATES MAGISTRATE JUDGE


By E-mail:
Hon. Jams Knoll Gardner
Michael P. Boyle, Esq.  mpboyle.law@verizon.net
Andrew C. Lynch, Esq.  andrew.lynch@ssa.gov
Eda Guisti, Esq.  eda.giusti@ssa.gov
M. Jared Littman, Esq.  jared.littman@ssa.gov

---

[10] Plaintiff may file objections to this Report and Recommendation within fourteen (14) days after being served with a copy thereof. Fed.R.Civ.P. 72. Failure to file timely objections may constitute a waiver of any appellate rights. *Leyva v. Williams*, 504 F.3d 357, 364 (3d Cir. 2007).